**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

DR. SHU-HUI WU                                                   PLAINTIFF

V.                                                   NO. 1:13-CV-00002-DMB-DAS

MISSISSIPPI STATE UNIVERSITY                                                   DEFENDANT

## MEMORANDUM OPINION AND ORDER

This is an employment discrimination action brought by Plaintiff Dr. Shu-Hui Wu against her current employer, Defendant Mississippi State University. Plaintiff alleges that Defendant engaged in unlawful race and national origin discrimination when it: (1) calculated her annual pay increases between 2011 and 2013; and (2) denied her promotion to the rank of full Professor in its History Department between 2011 and 2012. Plaintiff also alleges that Defendant retaliated against her for engaging in activity protected by Title VII of the Civil Rights Act.

Before the Court are: (1) Defendant's motion to exclude the expert testimony of Donald Rubin [50]; (2) Defendant's motion to exclude the expert testimony of Saranna Thornton [60]; (3) Defendant's motion to exclude the expert testimony of Brenda Ungerland [55]; (4) Defendant's motion for summary judgment [62]; and (5) Plaintiff's motion for partial summary judgment [57].

## I
### Standard on Summary Judgment

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 22–23 (1986)). To award summary judgment, "[a] court must be satisfied

that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Norwegian Bulk Transp. A/S*, 520 F.3d at 411–12 (internal quotation marks omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id*. at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191–92 (5th Cir. 2011) (citation and internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Factual Background

### A. The Parties

Plaintiff Shu-Hui Wu is an Asian female of Chinese origin. Doc. #1 at ¶ 10. Plaintiff earned a Ph.D. from the Freie University in Berlin, Germany, in 1994. *Id*. at ¶ 9. Defendant Mississippi State University ("MSU") is a public educational institution that was founded in

1878.  *Id*. at ¶ 11.  Plaintiff has been employed as a tenure-track academic in Defendant's Department of History ("Department") since 1998.  *Id*. at ¶ 9.  During the time period relevant to this suit, Alan Marcus served as Head of the Department.  *Id*. at ¶¶ 1–2.

Faculty members in the Department hold one of three ranks:  Assistant Professor, Associate Professor, or Professor.  Doc. #66-13 at ¶ 6.  Assistant Professors do not hold tenure, but "upon proper application, may be considered for promotion to Associate Professor with tenure."  *Id*.  While Assistant Professors must seek promotion to the rank of Associate Professor in order to remain on the faculty, there is no requirement that an Associate Professor must apply for promotion to the rank of Professor.  *Id*. at ¶ 7.  Although the Department only allows an Assistant Professor one or two promotion applications, an Associate Professor may seek promotion as often as he or she wants.  *Id*.

**B.  Plaintiff's Receipt of Tenure**

On October 5, 2003, Plaintiff submitted an Application for Promotion and/or Tenure in which she sought promotion from Assistant Professor to Associate Professor.  Doc. #62-3.  In her application, Plaintiff listed the following as her "[c]urrent or on-going research:"

> Second monograph:  *Lien Hang (1878-1936):  Taiwan's Search for Identity and Tradition*, 2004 Indiana University Oriental Series (forthcoming)
>
> 5th Article:  "Lien Hang (1878-1936) and the General History of Taiwan." to be published in spring 2004 Journal of Third World Studies.

Doc. #62-3 at 2.

Under "[p]ublications," Plaintiff listed two books, *Die Eroberung von Qinghai unter Beuchksichtigung von Tibet und Khams*, a "[r]eworked dissertation published … in Germany;" and *Lien Heng (1878-1936):  Taiwan's Search for Identity and Tradition*, indicated as

"Forthcoming. To be published in June 2004 by Indiana[] University Oriental Series."[1] *Id*. at 3. Plaintiff also listed as publications five articles and six "Professional papers read." *Id*.

On June 28, 2004, Plaintiff's application for promotion to Associate Professor was approved. Doc. #62-2. In approving the application, Godfrey Uzoigwe, then the Department Head, did not count the *Lien Heng* book toward Plaintiff's tenure application. He did, however, report that the book was "evidence of progress on her part … that she's not going to be one of those who will get tenure and stop writing." Doc. #84-13 at 77–78.

**C. The Professor Promotion Process**

In the Department, an Associate Professor seeking promotion to Professor must demonstrate excellence in research and either teaching or service. Doc. #66-13 at ¶ 8. With regard to research and scholarship, the Department's promotion policy provided:

> To be considered by the Department for promotion from associate professor to professor, the candidate must have made substantial scholarly contributions since the last promotion. In addition to published works presented for promotion from assistant to associate professor, the candidate, at the minimum, must have published another book-length, peer-reviewed historical monograph with a reputable scholarly publisher. The candidate is also encouraged to produce three other publications, one of which should be an article in a leading journal in his or her field.

Doc. #62-8 at 8–9. Pursuant to this policy, "[c]onsideration for … promotion may be initiated in writing either by the Department Head or by an individual faculty member who has met the minimum time requirement for the action requested." *Id*. at 3. Regardless of the initiator, "[t]he department head has the responsibility to assist, where appropriate, the faculty member in preparing materials for tenure and promotion review." Doc. #62-9 at 15. Once under consideration, the faculty member must:

---

[1] The book was not published until 2005. *See* Doc. #88-48.

complete in detail the form provided by the University outlining his/her accomplishments at Mississippi State, and elsewhere if applicable, and giving a summary of future plans for academic and professional growth …. The Department requires four external letters of evaluation from peer or peer-plus institutions speaking to the candidate's research. One external referee will be selected by the candidate, the Department Committee on Tenure and Promotion, and the Department Head, respectively, from a mutually agreed upon list ….

After studying all of the available, pertinent, and documented evidence in each case, the departmental Committee will report its recommendation in writing to the Department Head …. The Department Head's own recommendation, again based on all … pertinent … evidence … may agree or disagree with the recommendation of the Committee ….

The recommendations of both the Committee and the Department Head will be forwarded to the Dean of Arts and Sciences …. Procedures beyond that point will follow the guidelines provided in the current Faculty Handbook.

Doc. #62-8 at 4–5 (underlining in original).

Once the Dean of Arts and Sciences receives the recommendations from the Department Committee and Department Head, she forwards the application and recommendations to the College Committee who, in turn will make a recommendation to the College Dean. Doc. #62-10 at 11–12. Then, the Dean must conduct an independent evaluation of the candidate's teaching, research and/or creative achievement, and service. *See id.* at 11. The Dean will then forward her evaluation, along with the recommendations of the Department and the College Committee, to the Provost. *Id*. at 12. The Provost will review all relevant documents and make a recommendation to the University President, who will issue the final decision. *Id*.

If the President decides against promotion, the faculty member may appeal to the University Committee on Promotion and Tenure. *Id*. If the University Committee on Promotion and Tenure upholds the President's decision, the faculty member may appeal to the Board of Trustees of the Institutions of Higher Learning. *Id*.

The University Policy requires that, as the applicant moves through the process, she:

will be officially notified of the disposition of the application at each level of the process. A written recommendation and rationale will be made at each level in the process. These written recommendations will be provided to the candidate and placed on file by the department head, dean or director and provost. These recommendations will be the basis of future discussions of professional development between the faculty member and the department head. The candidate may respond in writing to the written recommendation and rationale of either the department head or the dean/director, or both. If the candidate elects to provide a written response to a recommendation, it must be submitted to the review level to which the response is made within 5 working days of receipt of the recommendation. The response will become part of the formal application.

Doc. #62-10 at 10. The Department's policy does not contain a notification provision.

### D. Plaintiff's Post-Tenure Scholarly Activity

In 2004, after Plaintiff received tenure, one of the articles listed on her tenure application, *Lien Heng (1878-1936) and the General History of Taiwan*, was published. Doc. #62-4. Similarly, due to publication delays, *Lien Heng (1878-1936): Taiwan's Search for Identity and Tradition*, the second book listed on Plaintiff's tenure application, was published in December 2005. Doc. #88-48.

Following the publication of the second book, Plaintiff drafted four articles, *The Great Migration: Inception of the Chou Identity*; *Fighting for His Majesty Accretion of the Greater Shang (ca. 1200-1045 B.C.)*; *Debates and Decision-Making: The Battle of the Altai Mountains in AD 91*; and *On Shiji Chapter Twenty Two, Table Ten*. Doc. #62-4. By July 2011, three of the articles had been accepted for publication but none had been published. *Id.* In addition to her written production, Plaintiff presented six papers at various academic gatherings. *Id.*

### E. Department Salary Policy

Defendant sets the starting rate for faculty positions based on "outside market forces" in order "to compete with other institutions … attempting to fill faculty positions. Doc. #66-13 at ¶ 17. Post-hire, a faculty member's "salary is no longer directly impacted by market conditions

[but is] adjusted and changed when, and if, the state's budget affords MSU an opportunity to provide salary increases." *Id*. at ¶ 17. Additionally, upon promotion from Assistant Professor to Associate Professor, a faculty member "customarily" receives a $5,000 raise. *Id*. at ¶ 20.

Department Head Marcus testified that discretionary raises are determined "almost exclusively" by publication, under which books are "by the far most important" metric. Doc. 84-2 at 153–54. In justifying his emphasis on books, Marcus explained that "[a] good historian will publish maybe five books in his or her [career of] thirty to forty years." *Id*. at 154. In contrast, Marcus observed that a historian should average a peer-reviewed article a year. *Id*. at 154–55. Thus, while books are the most valuable source of contribution, Marcus stated that "[p]eer reviewed, primary source, historical articles in scholarly history journals, chapters of books and edited books are next in [the] hierarchy." Doc. #62-15. Scholarly production, for raise purposes, is measured from the date of the last raise period. *Id*.

### F. Plaintiff's Salary History

In her first year as Associate Professor (fiscal year 2005), Plaintiff earned a salary of $47,688, including the $5,000 raise accompanying her promotion to the position. Doc. #88-3; Doc. #66-13 at ¶20. The Department did not award merit raises for fiscal year 2006. Doc. #88-3. For fiscal year 2007, Marcus recommended that Plaintiff receive a salary raise of approximately 11.8%. Doc. #66-13 at ¶ 14. Marcus recommended this raise, which was above the budgetary guidelines, "in large part due to her publication of a book in December 2005." *Id*. The recommendation was accepted and Plaintiff's salary increased to $53,312. Doc. #88-3. On Marcus' recommendation, Plaintiff's salary increased to $55,178 for fiscal year 2008. *Id*.; Doc. #66-13 at ¶ 14.

Due to budget constraints, Marcus did not recommend any pay raises (but for those related to promotions) for fiscal years 2009, 2010, and 2011. Doc. #66-13 at ¶ 13. As of fiscal year 2011, Plaintiff was the lowest paid of the Department's five Associate Professors.[2] *See* Doc. #88-3. As of the same time, Plaintiff earned less than four of the ten Assistant Professors. *See id.*

On June 2, 2011, Marcus received approval to grant merit raises ranging from two percent to six percent. Doc. #62-14. Based on Plaintiff's "publication record," Marcus recommended that she receive a 2% merit raise. Doc. #66-13 at ¶ 25. Following this recommendation, Plaintiff's salary increased to $56,281. Doc. #88-3.

## G. Plaintiff's Promotion Application

On September 18, 2011, approximately twelve days before the application deadline, Plaintiff submitted an application for promotion to the rank of Professor. Doc. #62-4. In her application, Plaintiff listed: one book publication (*Lieng Heng (1878-1936)*); five articles; six professional papers; and four funding grants. *Id.* at 3–4. Of the five articles Plaintiff listed, three were listed as "forthcoming;" one was listed as "[a]ccepted during the process of tenure and promotion, published after being tenured;" and one was listed as "under review." *Id.* at 3.

### 1. Solicitation of Letters

Following the initiation of Plaintiff's application, the Department solicited letters of support from approximately twenty relevant academics identified by the Department's Committee and Marcus. Doc. #84-2 at 25, 27; *see also* Doc. #66-9. In the process of compiling the list, Marcus declined to accept offers from two faculty members to identify potential reviewers. *See* Doc. #84-2 at 34–35. Marcus explained that, while he was "not privy to who was

---

[2] The salaries for the remaining Associate Professors were: (1) Gregory Adkins - $61,200; (2) Richard Damms - $60,000; (3) William Hay - $62-970; (4) Peter Messer - $61,924; and (4) Jason Phillips - $61,500. Doc. #88-3.

solicited," he met "with the entire [Promotion and Tenure] committee and passed out the external reviewers to talk about the list."  Doc. #84-2 at 25.

Once the reviewers were contacted, three[3] potential reviewers declined to partake in the process because, at least in part, their specialties did not align with Plaintiff's.  *See* Doc. #88-41; Doc. #88-42; Doc. #88-43.  One of the declining reviewers offered to suggest another potential reviewer, but when Jason Phillips, Associate Professor of History and point of contact for the potential reviewers, passed along the offer to the Department Committee, no action was taken.[4] Doc. #84-9 at 27.  The remaining reviewers either failed to respond or declined to participate in the process.

Plaintiff failed to obtain the necessary four reviewers and Marcus declined to consider her application.[5]  Doc. #62-22.  Plaintiff appealed this decision, and the University Promotion and Tenure Committee recommended consideration of the application.  *Id*.  On December 8, 2011, Provost Jerome Gilbert accepted the University Committee's recommendation and directed the Department to consider Plaintiff's application.  *Id*.  In issuing this direction, Gilbert noted that the Department should "not infer from my decision that any judgments have been made as to the completeness or merits of Dr. Wu's application package."  *Id*.

## 2.  Department Committee

At the time of Plaintiff's application, the Department Committee consisted of three members:  (1) Christopher Snyder, a white male; (2) Stephen Middleton, an African American

---

[3] Plaintiff contends that four potential reviewers declined based on lack of specification.  However, two of the four citations are identical.  *See* Doc. #82 at 12 (citing to Doc. #88-41 and Doc. #88-44).

[4] Although the failure to follow-up with potential reviewers does not appear to be a violation of University, Departmental, or College policy, Provost Jerome Gilbert testified that he would expect a department to "continue to solicit [letters] as good practice."  Doc. #84-8 at 39.  Similarly, Dean Gary Myers testified that if he had been aware of non-contacted qualified reviewers, he would have "looked into" the issue.  Doc. #84 at 24.

[5] Marcus explained that "I thought that you needed four letters to be considered for promotion, and since there were not four letters, I thought the natural consequence would be you couldn't be considered."  Doc. #84-2 at 73.

male; and (3) Godfrey Uzoigwe, a male of Nigerian origin. Doc. #66-13 at ¶ 5. On January 20, 2012, the Department Committee recommended denial of tenure "since the required number of letters (4) from external reviewers were not produced …." Doc. #62-23. In reaching this conclusion, the Department Committee found Plaintiff: (1) "presented evidence of satisfactory teaching;" (2) "presented evidence of more than satisfactory service to the department, college, and university;" and (3) "demonstrated excellence in research based on two letters from external reviewers in her field." *Id*. One of the Department Committee members voted in favor of promotion. *Id*.

### 3. Department Head

On January 3, 2012, Marcus executed a written recommendation against Plaintiff's application.[6] Doc. #62-25. In addition to what appears to be a standardized form, Marcus submitted an eleven-page memorandum outlining the reasons for his recommendation ("Memorandum").[7] *Id*. In what may best be described as a scathing evaluation, Marcus wrote "I cannot support Shu-hui Wu's application for promotion to professor. She has not demonstrated excellence in any of the three areas under consideration – research, teaching and service." *Id*. at 1. Marcus also observed that, due to the lateness of Plaintiff's application, the Department Committee "contacted over 20 scholars [and that] records show that in no other case has the [C]ommittee needed to contact more than nine scholars to receive five reviews."[8] *Id*. at 3.

---

[6] It is unclear why this form was executed before the Department Committee offered its recommendation.

[7] Marcus testified that when he recommends denial of a promotion application he sometimes does not submit a memorandum. Doc. #84-2 at 113. When he submits a memorandum with a denial, he tries "to talk about the strengths as well as the more significant weaknesses, so that if the institution was interested in other things … they would have something to hang on to." *Id*.

[8] This statement is contradicted by an assertion made by Marcus in a September 18, 2011, e-mail to Plaintiff in which he stated, "Even when we [solicit letters] in the spring, the committee/me have found it necessary to generate a list of 10 or more referees to receive the requisite four additional letters." Doc. #88-9.

With regard to Plaintiff's research, Marcus observed "I have no faculty member – even those who have been here for a year or two and have a record only that long – who has been less productive and less engaged with the historical profession than Wu has been from 2006 through the first half of 2011." *Id.* In making this observation, Marcus noted that: (1) one of the articles Plaintiff claimed as forthcoming was slated for publication in a journal that "is not a significant historical publication;" (2) another article listed as forthcoming was slated for publication in a new journal with a "totally blank" website; and (3) a chapter Plaintiff listed as a forthcoming publication was slated for publication in a book that did not appear on the alleged publisher's website. *Id.* at 2. While Marcus declined to suggest "that Wu is necessarily being duplicitous," he noted that "these three venues are not the sort of outlets where you would see the publications of a noted senior scholar. They do not connote excellence." *Id.*

Turning to *Lien Heng*, Marcus noted that Plaintiff's first book publication of her dissertation in Germany, could not have satisfied her grant of tenure because "there is almost always no blind peer review when German dissertations are published." Doc. #62-25 at 4. Thus, Marcus concluded that "[t]he Lien Heng [book] constituted the book that Wu needed for her mandatory tenure and promotion case [and that the] department of history promotion and tenure committee evaluated both manuscripts as part of her tenure package."[9] Doc. #62-25 at 4. In making this statement, Marcus explained, "I am arguing … the book was a fundamental part of her tenure and promotion application and that Wu would not have gotten tenure and promotion had it not been for her ability to claim the Lien Heng book." *Id.* at 4–5. Marcus wrote that because the book "met the associate professor standard [it] should not be employed a second

---

[9] Uzoigwe testified that he told Marcus that the *Lien Heng* book was not counted toward Plaintiff's tenure application. Doc. #84-13 at 77–78. Marcus testified that Uzoigwe told him that he did not remember what role *Lieng Heng* played in Plaintiff's tenure process. Doc. #84-2 at 83. Drawing every reasonable inference in favor of Plaintiff, the Court assumes for purposes of summary judgment that Uzoigwe told Marcus that the book was not counted toward the tenure application.

time to meet the professor standard. *In any case, Wu's research productivity falls far short of the standard of excellence.*"[10] *Id.* at 5 (emphasis in original).

As to teaching, Marcus noted, "English is not [Plaintiff]s first language [and s]he uses Powerpoint frequently and shows motives to overcome the language barrier." Doc. #62-25 at 5. Marcus also remarked that, while Plaintiff "does not attract graduate students … [t]hat is not a problem." *Id.* However, Marcus expressed concern regarding a "precipitous[]" decline in student evaluations, in which "students complain that she doesn't respond to their emails, doesn't keep her office hours, acts arbitrarily in class, or does not treat them with respect." *Id.* Marcus explained that, following the decline, Plaintiff "now ranks significantly below department, college and university averages." *Id.* In sum, Marcus wrote, "Wu's teaching style is at best unusual, at worst a violation of university protocol, maybe even operating policy. *In any case, I do not see how it can be said to rise to the standard of excellent*." *Id.* at 7 (emphasis in original).

In assessing Plaintiff's service to the university, Marcus noted that: (1) while Plaintiff claimed to be "Initiator and Founder of the Society of Ancient China and Co-Editor of the Journal of China," the listed publication did not appear on the web; (2) while Plaintiff claimed to be a member of the search committee for dean at Meridian (University), a member of the committee stated that Plaintiff never attended a meeting after the initial two; (3) while Plaintiff claimed to have been a member of the Robert Holland Faculty Senate from Fall 2006–Spring 2009, she was a "senator in name only," having attended only four meetings over the time period; (4) Plaintiff's service as "undergraduate coordinator" led to a sharp decline in history majors; (5) Plaintiff attended only half of the meetings of the Department's Promotion and Tenure Committee; and (6) Plaintiff failed to attend many faculty search meetings. *Id.* at 8.

---

[10] Marcus also observed that the dissertation-turned-book listed in her tenure application "was not like an American book" because "[p]ublication of a German dissertation in Germany is not like publication of a dissertation in America …. It [is] far closer to a reproduction of the dissertation tha[n] a rethought, reinvestigated work." *Id.* at 4.

Thus, Marcus concluded, "*Wu's service record within the university does not achieve the standard of excellent.*" *Id.* at 8 (emphasis in original).

Marcus did not provide Plaintiff a copy of his written recommendation. Marcus says he did not do so because it was not required under Department promotion policy.[11] Doc. #84-2 at 143, 145.

### 4. College Committee

On February 3, 2012, the College of Arts and Sciences Promotion and Tenure Committee voted 11-1, with two abstentions, against the proposition of Plaintiff's promotion. Doc. #62-27. In denying promotion, the College Committee wrote that "[t]he majority of the Committee did not find evidence of excellence in two areas." *Id.* More specifically, the Committee wrote:

> Dr. Wu has published a well-received book and has one paper under review and three others forthcoming. She has acquired four external grants. Dr. Wu has mentored two Master's students and has taught a number of courses, in which she has achieved student evaluations at or somewhat below the department average. Two external letters were received; one recommended promotion, but the other was equivocal on this point.

*Id.*

Although the Committee referenced Plaintiff's publication of a book, it appears that the timing of the book's publication was a concern. In an April 12, 2012, e-mail, Steve Shaffer, a member of the College Committee, wrote that Plaintiff's "two positive external letters on research were counterbalanced by Department Head's letter regarding some of the claimed research having already been applied to promotion to Associate Professor, and lack of clarity regarding what was published after last promotion." Doc. #88-35. Jannet Rafferty, another member of the College Committee, wrote that "[t]he main issue … was that the book she

---

[11] One member of the College Committee testified that this was a "serious breach of procedure." Doc. #84-12 at 52–53.

claimed as a major accomplishment had already been anticipated and counted when she was promoted to associate professor and granted tenure." *Id.*

### 5. College Dean

In an undated recommendation for promotion, Gary Myers, Dean of the College of Arts & Sciences, recommended that Plaintiff's request for promotion be denied. Doc. #62-29. In his recommendation, Myers wrote that "[s]ince [Plaintiff's] last promotion in fall 2004, she has authored 1 book with 3 articles 'forthcoming' 1 published and 1 under review. She has also presented 5 conference papers and served on 1 panel." *Id.* Myers observed that Plaintiff's "most recent book had been credited toward tenure … which raises questions of how publications should be reported and counted between promotions."[12] *Id.* Myers found that Plaintiff's "research record is rather thin for promotion to Professor at this time." *Id.* Myers, therefore, rated Plaintiff "High Satisfactory in Research." *Id.*

Next, noting that Plaintiff's student evaluation scores were "well below the department, college, and university averages," Myers ranked Plaintiff "Low Satisfactory in Teaching." *Id.* Finally, Myers listed Plaintiff's service activities without reference to the concerns expressed in Marcus' recommendation, and ranked her "Satisfactory in Service." *Id.*

### 6. Provost Recommendation

On March 6, 2012, Provost Jerome Gilbert notified Plaintiff that he recommended to the President that her application not be approved.[13] Doc. #62-30. Gilbert later testified that, in preparing his recommendation, he reviewed Plaintiff's application file, including Marcus' memorandum. Doc. #62-7 at 35–36. With regard to the memorandum, Gilbert testified that he

---

[12] Myers later testified that, in evaluating Plaintiff's application, he did not count her book "as something new … for the consideration for promotion to full." Doc. #84 at 30–31.

[13] It appears that prior to issuance of the Provost's recommendation, the University Promotion and Tenure Committee voted against Plaintiff's application. Doc. #62-31.

"looked at the letter … read the letter [and] looked at [Plaintiff's] CV … to see if [the dates of particular publications] matched up." *Id*. at 35. Gilbert explained that, while he considered the letter, he was "[n]ot excessively" influenced by it. *Id*.

### 7. President Decision

On March 23, 2012, Mark Keenum, President of MSU, notified Plaintiff that he was denying her application for promotion. Doc. #62-32. In his letter, Keenum informed Plaintiff, "I encourage you to continue your efforts in producing peer reviewed scholarship and to provide further evidence of excellence in teaching." *Id*.

### 8. Appeal

Plaintiff appealed the President's decision to the University Committee. Doc. #62-34. The University Committee heard the appeal on May 8, 2012, and issued a decision the same day declining to overturn the denial of promotion. *Id*. In its decision, the University Committee wrote that it "did not find in the documentation or testimony information to indicate that sufficient procedural errors were made that could have affected the outcome of the promotion decision." *Id*. The University Committee's decision was affirmed by Gilbert on May 9, 2012, and by Keenum on May 10, 2012. Doc. #62-35; Doc. #62-36.

## H. EEOC Charges

On February 8, 2011, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Doc. #57-1. In her Charge, Plaintiff alleged unlawful race, national origin, retaliation, and age discrimination. *Id*. Specifically, Plaintiff alleged:

> Since about August 2004, I have been employed as an Associate Professor. About August 15, 2010, I learned that newly hired, younger Assistant Professors were earning a higher salary than I was. I am the only Associate Professor who earns the lowest salary. In addition, I learned that other Associate Professors

received a higher salary increase than I received. My increase was the lowest of the Associate Professors. In addition, I am the only Associate Professor who does not have a teaching assistant. I believe I have been discriminated against because of my race (Asian), age (53), and national origin (Chinese) ….

*Id.*

On August 31, 2011, Plaintiff filed a second Charge of Discrimination. Doc. #57-2. In her second Charge, Plaintiff alleged that, in retaliation for her first charge, Defendant limited her salary increase "to 2% while others in [the] Department, whose performance is equal to or less, have received higher salary increases ranging from 4% to 6%." *Id.*

On July 1, 2012, Plaintiff filed a Third Charge of Discrimination. Doc. #62-13. This Charge alleged race, national origin, and retaliation discrimination arising from Plaintiff's allegation that she was "denied promotion in retaliation for … protective activity and because I am Asian American and Chinese."[14] *Id.*

## I. This Action

On January 17, 2012, Plaintiff filed this action in the Nashville Division of the Middle District of Tennessee. Doc. #1. In her complaint, Plaintiff alleges that Defendant: (1) engaged in unlawful salary discrimination based on Plaintiff's race, national origin, and prior EEOC activity; and (2) wrongfully denied her a promotion to Professor based on her race, national origin, and prior EEOC activity. The case was transferred to this district on December 28, 2012. Doc. #6.

Subsequent to transfer, the parties filed the instant cross motions for summary judgment. Doc. #62; Doc. #57. In its motion for summary judgment, Defendant seeks summary judgment against all claims. Doc. #62. In her motion, Plaintiff seeks summary judgment on two distinct

---

[14] Plaintiff's complaint alleges that she received a Notice of Right to Sue from the EEOC regarding her "charges of employment discrimination" and filed suit within 90 days of its receipt. Doc. #1 at ¶ 5. Defendant denies these allegations in its answer but has not since questioned whether Plaintiff failed to exhaust the administrative process.

issues: (1) that she is an "Asian female of Chinese origin;" and (2) that she "filed EEOC charges."  Doc. #58.  Additionally, Defendant has moved to exclude three experts proffered by Plaintiff.  Doc. #50; Doc. #55; Doc. #60.

## III
## Motions to Exclude

### A.  Applicable Standard

Rule 702 of the Federal Rules of Evidence allows opinion testimony from "a witness who is qualified as an expert by knowledge, skill, experience, training, or education," but only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), the United States Supreme Court "assigned to trial courts the responsibility of determining whether expert testimony under Rule 702 is not only relevant, but reliable."  *Hathaway v. Bazany*, 507 F.3d 312, 317 (5th Cir. 2007) (internal quotation marks omitted).  Commensurate with this duty, a trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592–93.  To this end, the proponent of the expert testimony "need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable."  *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (quoting *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998)).

When considering reliability, *Daubert* dictates that trial courts should consider "the extent to which a given technique can be tested, whether the technique is subject to peer review and publication, any known potential rate of error, the existence and maintenance of standards governing operation of the technique, and, finally, whether the method has been generally accepted in the relevant scientific community." *Hathaway*, 507 F.3d at 318 (citation omitted). The *Daubert* factors "are not mandatory or exclusive." *Id.* Rather, the district court should consider whether the enumerated factors "are appropriate, use them as a starting point, and then ascertain if other factors should be considered." *Id.* (citing *Black v. Food Lion*, 171 F.3d 308, 311–12 (5th Cir. 1999)).

### B.  Motion to Exclude Rubin

In support of her claim for employment discrimination, Plaintiff seeks to rely on an expert report produced by Dr. Donald Rubin [50-1]. Analytically, Rubin's opinions in his report may be separated into three categories:  (1) an opinion that Plaintiff has the intelligibility of a native English speaker; (2) an opinion that Plaintiff's intelligibility is within the "desirable" range for college instructors; and (3) an opinion that, due to "reverse linguistic stereotyping," "[i]t is not improbable" that "some students" gave Plaintiff an unfairly low evaluation. Plaintiff seeks to introduce these opinions to show that she was qualified for promotion to the position of Professor, "that she is an excellent teacher and that she is a more excellent teacher than her student evaluations would suggest." Doc. #71 at 7.

Defendant has moved to exclude Rubin's report, arguing that Rubin's opinions are: (1) irrelevant; (2) unhelpful to the jury; (3) based on an unreliable methodology; and (4) based on unreliable application of the unreliable methodology. Doc. #50.

"[W]hether the proposed testimony will assist the trier of fact to understand or determine a fact in issue … goes primarily to the issue of relevancy." *Sudo Props., Inc. v. Terrebonne Parish Consol. Gov't*, No. 04-2559, 2008 WL 2623000, at *8 (E.D. La. July 2, 2008); *see also Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). Put differently, "expert testimony is not relevant, and thus, inadmissible if it is not helpful." *Sudo Props., Inc*., 2008 WL 2623000, at *8.

As an initial matter, it is unclear how, if at all, Plaintiff's intelligibility is relevant to this action. In her response brief, Plaintiff appears to argue that her intelligibility is relevant as it relates to her qualification for the position of Professor. However, Defendant does not dispute that Plaintiff's speech is intelligible or that her intelligibility was sufficient for a Professor position. In the absence of such a dispute, the Court concludes that Rubin's opinions on Plaintiff's intelligibility will not help the trier of fact in this case. *See Anserphone of New Orleans, Inc. v. Protocol Commc'ns, Inc.*, No. 01-3740, 2002 WL 34371502, at *1 (E.D. La. Sep. 13, 2002) ("[e]xpert testimony as to … undisputed fact is clearly inappropriate and unnecessary") (internal quotation marks omitted).

Furthermore, an expert opinion will not help a jury if it is offered on an issue for which a witness's scientific, technical, or other specialized knowledge is not needed. *Blythe v. Bumbo Int'l Trust*, No. 6:12-cv-36, 2013 WL 6190284, at *4 (S.D. Tex. Nov. 26, 2013) (collecting authority). "[W]hether an accent or culturally distinctive speech pattern is sufficiently intelligible for the average person to understand is a matter squarely within the competency of the average juror." *E.E.O.C. v. W. Customer Mgmt. Grp., LLC*, 899 F. Supp. 2d 1241, 1252 (N.D. Fla. 2012). In the same vein, expert testimony is unnecessary to help a juror decide whether a person's intelligibility qualified them for a position. *Id*. (expert testimony unnecessary

"for a layman to determine whether the sound of a person's accent so obstructed the intelligibility of his speech that it was a legitimate reason not to hire him for a CSR position"). Thus, even if Rubin's testimony regarding Plaintiff's intelligibility could be deemed relevant, it would not be helpful to the trier of fact and may not serve as the basis of an expert opinion. *Id*.

As for Rubin's opinion that it "is not improbable" that some students were impacted by Plaintiff's accent, the Court assumes without deciding that testimony regarding the role of inherent biases in student evaluations could be helpful to the trier of fact in a discrimination case. *See Dobbs-Weinstein v. Vanderbilt Univ.*, 1 F. Supp. 2d 783, 800–801 (M.D. Tenn. 1998) (considering report prepared by Rubin on motion for summary judgment but ultimately concluding that, under the circumstances, the evidence did not show discrimination). However, "imprecise and unspecific testimony" should be excluded as unhelpful to the jury. *See Boye v. Connor Corp.*, No. 12-cv-12108, 2014 WL 4772720, at \*5 (E.D. Mich. Sep. 24, 2014) (collecting cases); *see also* 6 Jones on Evidence § 42:32 (7th ed.) ("Statements frequently appear in the case law that for an expert to testify that defendant's conduct was unfortunate or that certain events or substances 'might' or 'could' have caused a specified result, are of little help to a fact-finder and therefore should be excluded.").

Rubin opined that "for some students, reverse linguistic stereotyping adversely affected their perceptions of Professor Wu and her teaching performance." Doc. #50-1 at 2. Defendant objects to the vagueness of Rubin's conclusion on the grounds that it "shows extreme uncertainty as to his conclusion." Doc. #51 at 9.[15] Plaintiff responds that Rubin's conclusion "merely meant 'it is probabl[e].'" Doc. #71 at 9. Plaintiff essentially argues that if the occurrence of an event is "not improbable" then such occurrence must be probable. Putting aside the semantic error in

---

[15] While this objection is framed as to the reliability of the conclusion, this Court will address it under the helpfulness prong.

Plaintiff's argument that an event must be either probable or improbable, Rubin's opinion regarding biases suffers from other vagaries. Rubin does not specify how many students he meant by "some" or to what extent the reverse linguistic stereotyping "adversely affected" the perceptions of Plaintiff's teaching. This lack of specificity reduces Rubin's opinion in essence to one that there is a 50-100% ("not improbable") chance that reverse linguistic stereotyping impacted an unknown number of students to an unknown degree. This opinion is too vague to be helpful to the trier of fact and, as such, may not be considered as expert testimony.

The Court concludes that none of Rubin's opinions would be helpful to the trier of fact in resolving this case. Thus, Defendant's motion to exclude Rubin's report must be granted.

### C. Motion to Exclude Thornton

Plaintiff has also proffered an expert report prepared by Saranna Thornton, a professor of economics at Hampden-Sydney College in Virginia, who served as Department Chair of Hampden-Sydney's Economics Department from 2008-2011, holds a Ph.D. in Economics and Policy Analysis from Carnegie Mellon University, and has published extensively in the field of economics in education. Doc. #72-1. Thornton's report compares the salaries and scholarly output of the twelve Associate Professors (Plaintiff's position during the relevant period) of Defendant's History Department. Doc. #65.

In her report, Thornton purports to address an argument made by Defendant that Plaintiff's relatively low annual pay increases were due to low scholarly production.[16] To this end, Thornton sorted "the twelve Associate Professors … into three tiers, lowest, middle, and highest." Doc. #65 at 4. Thornton's ranking "placed the greatest weights on sole-authored books published, then edited books, and journal articles." *Id*. According to Thornton, this

---

[16] Publication was "almost exclusively" the basis for determining the amount of pay raises. Doc. #84-2 at 153.

ranking "is consistent with the way that scholarly output is ranked in the Department of History," as Thornton interpreted statements made by Alan Marcus, the Head of the Department of History. *Id.* at 4–5. Additionally, Thornton conducted a subjective comparison of faculty reviews and course assignments within the Department of History. *Id.* at 8–16.

Based on this analysis, Thornton offered the following "observ[ations]:"

- A merit pay compensation system that appears to be a 'black box', based on subjective and unequal evaluations of faculty productivity as determined by Dr. Marcus.
- A compensation system, enacted by Dr. Marcus, that took Professor Wu from most highly paid among her relevant comparators to lowest paid, despite the fact that she increased her own output relative to her past performance and that she outperformed most of her peers in publication of peer reviewed scholarly research.
- A system of assigning classes by Dr. Marcus that pigeon holes Professor Wu into exclusively or predominantly teaching undergraduate students.
- An annual review system that is not systematic, not formal, and filled with invective towards an Asian professor who is excelling in the performance of her job, while other professors who are not meeting University expectations are flattered, praised, and 'rooted' for.

Doc. #65 at 16.

Plaintiff has since clarified that she is not seeking to introduce Thornton's opinions regarding the assignment of classes or the evaluation system. Doc. #72 at 1. Rather, Plaintiff intends to limit Thornton's report to the opinions comparing "each of the associate professors' merit increases with his or her research productivity." *Id.* at 3. Plaintiff states that such opinions are relevant to show that Defendant's stated justification for her low pay raises (Plaintiff's allegedly low scholarly production) is pretext. Defendant responds that these opinions are unhelpful and unreliable. Doc. #61 at 6–8.

Defendant, quoting *Goswami v. DePaul University*, 8 F. Supp. 3d 1019 (N.D. Ill. 2014), argues that Thornton's opinions regarding scholarly output would not be helpful to the jury because "assessments of scholarship by universities are inherently subjective and not

measureable by objective criteria." Doc. #61 at 6 (internal quotation marks omitted). Defendant also argues that the opinions are "of no value and only serve[] to deflect the jury's attention from the real issue in the case, which is not whether MSU was wrong about Wu's scholarship, but whether MSU's assessment of Wu was pretext for intentional discrimination." *Id*.

First, a plaintiff in an employment discrimination case may show pretext "either through <u>evidence of disparate treatment</u> or by showing that the employer's proffered explanation is false or unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (emphasis added, internal quotation marks and citation omitted). Plaintiff essentially seeks to prove pretext by offering Thornton's report as evidence that less productive members of the faculty received higher pay raises. Such evidence, if otherwise admissible, would certainly be relevant to the issue of pretext as proof of disparate treatment. *Id*. *Goswami*, though, involved proposed expert testimony regarding the <u>quality</u> of scholarly production, not <u>quantity</u> of scholarly production (about which Thornton seeks to testify).

However, even if explanation of the scholarly output required expert testimony, Thornton's opinion would be irrelevant to the issue of pay discrimination. Defendant claims that the allegedly discriminatory pay increases were due to low scholarly production in the "salary adjustment period" from 2008-2013. *See* Doc. #64 at 17–18. However, Thornton analyzed research productivity for associate professors without regard to when scholarship was actually produced. Thus, while Thornton's opinions on productivity are arguably relevant to each professor's output throughout their individual careers, they are not helpful in assisting a trier of fact decide whether Defendant's stated reason for Plaintiff's salary increases (low scholarly output during the salary adjustment periods) was actually pretext for unlawful discrimination. Accordingly, her research productivity ranking is inadmissible expert opinion.

**D. Motion to Exclude Ungerland**

Plaintiff seeks to rely on the expert testimony of Brenda Ungerland to diagnose Plaintiff's psychological injuries and establish the causal relationship between those injuries and the alleged employment discrimination. To that end, Ungerland interviewed Plaintiff on December 26, 2013, and then summarized her findings in a report. Doc. #55-1. Ungerland's report can be divided into three sections: (1) a narrative history of the alleged discrimination;[17] (2) Ungerland's diagnosis of Plaintiff's psychological injuries;[18] and (3) Ungerland's opinion that Plaintiff's injuries are a direct result of working for Defendant. Ungerland did not perform a physical exam of Plaintiff, conduct third party interviews, nor review testimony, but rather formed her opinions solely from the December 26, 2013, interview and Plaintiff's medical records. Doc. #72 at 2–3. In its motion to exclude, Defendant argues that Ungerland is unqualified and that her opinions are unreliable.

Under Rule 702 and *Daubert*, a district court "must be assured that the proffered witness is qualified to testify by virtue of his knowledge, skill, experience, training, or education." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013) (citations and internal quotation marks omitted). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999); *see also United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008) ("expert testimony results from a process of reasoning which can be mastered only by specialists in the field"). Here, Plaintiff seeks to qualify Ungerland in the

---

[17] Regarding the narrative history, since Ungerland noted that "Dr. Wu has provided a precise timeline with specific details of the unfair treatment that has occurred since 2007," Doc. #55-1 at 1, Ungerland's mere recitation of Plaintiff's account of the relevant facts would not be helpful to the trier of fact.

[18] Ungerland's report also contains diagnoses of Plaintiff's physiological injuries, however, Plaintiff concedes that such testimony is inadmissible. Doc. #73 at 2.

field of clinical psychology. Doc. #73 at 8 ("Ungerland's Curriculum Vita illustrates that she is well educated and experienced in clinical psychology."). The field of clinical psychology is defined as the "[d]iagnosis and non-medical treatment of mental and emotional disorders." 1 Attorneys Medical Deskbook § 7:26.

Since 1997, Ungerland has served as the Clinical Director at Lifepath Integrative Therapy in Southport, Connecticut and underwent clinical training in "MindBody Medicine" at Harvard University Medical School. Doc. #55-1. Her website states that she is a "[h]ealth psychologist, author, seminar leader, [and] teacher of yoga and meditation." Doc. #55-2. A review of Ungerland's curriculum vitae indicates that she obtained a B.A. in psychology from Manhattanville College and a M.A. in psychology from Columbia University Teachers College in 1966. Doc. #75. Ungerland's curriculum vitae does not reflect evidence of a clinical psychologist licensure in any state[19] or the maintenance of an active clinical practice.[20] Furthermore, there is no evidence that Ungerland attends clinical psychology conferences or continuing education courses. Thus, in essence, Plaintiff seeks to qualify Ungerland as an expert in clinical psychology based on nothing more than Ungerland's general education in the field of psychology.

While "[t]he American Psychological Association recognizes only the specialties of: clinical psychology, counseling psychology, industrial/organizational psychology, and school

---

[19] Licensure requirements vary by state and are promulgated by state licensing boards. Connecticut law provides that "[n]o person shall practice psychology unless he has obtained a license as provided in section 20-188. The practice of psychology means the rendering of professional services under any title or description of services incorporating the words psychologist, psychological or psychology, to the public or to any public or private organization for a fee or other remuneration." Conn. Gen. Stat. § 20-187a (2014). Mississippi law similarly requires any person holding herself to be a psychologist to be licensed by the State Board of Psychological Examiners. Miss. Code. Ann. § 73-31-13 (1972).

[20] Ungerland's curriculum vitae represents that she "[c]onsults with individuals, couples, groups, privately and through corporations, hospitals and medical centers." Doc. #75. There is no indication what these consultations entail.

psychology … there are many other types of psychology being practiced." 1 Attorneys Medical Deskbook § 7:26. Indeed, the Attorneys Medical Deskbook identifies <u>sixteen</u> different fields of psychology. Here, there is no evidence that either of Ungerland's degrees required coursework in clinical psychology or that Ungerland pursued any such coursework while at school. In the absence of such evidence the Court cannot conclude that Plaintiff's education qualifies her as an expert in the field of clinical psychology. *See generally In re Yasmin and YAZ (Drospierenone) Mktg., Sales Practices and Prods. Liability Litig.*, No. 3:09-md-02100, 2011 WL 6733952, at *4 (S.D. Ill. Dec. 16, 2011) ("Indisputably, a medical degree does not qualify a doctor to opine on all medical subjects.") (collecting authorities).

While a proponent of expert testimony need not establish <u>all</u> five *Daubert* criteria ("knowledge, skill, experience, training, or education") to meet her burden of proof under Rule 702, failure to establish <u>any</u> weighs heavily against qualification as an expert in the field of clinical psychology. *Compare Edmonds v. Illinois Cent. Gulf R. Co.*, 910 F.2d 1284 (5th Cir. 1990) (finding clinical psychologist who held doctorate in psychology unqualified to testify as to causation regarding medical condition); *with Johnson v. BAE Sys. Land & Armaments, L.P.*, No. 3:12-CV-1790, 2014 WL 1714487, at *31 (N.D. Tex. Apr. 30, 2014) (qualifying doctor who held doctorate in clinical psychology, was a tenured professor at the University of Texas at Austin, maintained an active clinical practice for 30 years, and regularly presented his research at national professional conferences); *and Lee v. Nat'l R.R. Passenger Corp. (Amtrak)*, No. 3:10-CV-392, 2012 WL 92363, at *3 (S.D. Miss. Jan. 11, 2012) ("Although *Daubert* is flexible, it is not so forgiving as to permit testimony by a witness whose expertise rests solely on a 15-hour continuing education course."). Because Plaintiff has failed to introduce any evidence showing

expertise in clinical psychology, the Court must conclude that she is unqualified in this field under *Daubert*[21] and that her opinion testimony should be excluded.[22]

## IV
## Adverse Inferences

In her response to Defendant's motion for summary judgment, Plaintiff asks this Court to draw adverse inferences from Defendant's alleged refusal to disclose: (1) "calculations prepared by Department Head Marcus of teaching evaluations of the Department of History faculty;" and (2) certain unspecified documents showing that "faculty at MSU less qualified than Dr. Wu have been promoted to full professor." Doc. #82 at 9, 18.

"[A] party seeking to obtain an adverse inference based on non-production … of documents must show bad faith." *Kermode v. Univ. of Miss. Med. Ctr.*, No. 3:09-cv-584-DPJ-FKB, 2011 WL 2619096, at *4 (S.D. Miss. July 1, 2011) (quoting *Jobe v. ATR Mktg., Inc.*, 189 F.3d 466, at *6 n.3 (5th Cir. 1999) (unpublished table decision)). Here, Plaintiff has offered no

---

[21] In reaching this conclusion, the Court notes that it is unmoved by Plaintiff's attempt to distinguish Ungerland from the proffered psychology expert in *Previto v. Ryobi North America, Inc.*, 766 F. Supp. 2d 759 (S.D. Miss. 2010). In that case, a party sought to introduce a psychological assessment performed by a Doctor of Education who was not licensed to practice psychology or psychiatry. The defendants sought to exclude the testimony on the grounds that the proposed expert lacked "any knowledge, skill, experience, training, and education to provide an expert opinion in the scientific fields of psychiatry and/or psychology...." In excluding the expert testimony, the court noted that it was "unable to locate any case law permitting opinion testimony on the [psychological test and results] by persons who are not licensed as psychiatrists or psychologists." *Id.* at 769. Plaintiff's argument that *Previto* supports Plaintiff's position that Ungerland is qualified to testify as an expert in clinical psychology fails because Ungerland, like the proposed expert in *Previto*, is not a licensed psychologist. Additionally, Ungerland's report does not set forth any basis which would otherwise lead the court to believe she is qualified to provide such testimony.

[22] Even assuming that Ungerland is qualified as an expert in the field of clinical psychology, Plaintiff has failed to prove that the proffered testimony is reliable under *Daubert*. "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (citing *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 671 (5th Cir. 1999)). Plaintiff stated that Ungerland "uses the methodology of all psychologists in diagnosing emotional injury," Doc. #73 at 8, but failed to identify that methodology, let alone show that Ungerland reliably applied its principles to the facts in issue. Plaintiff offers no evidence to prove that Ungerland conformed with the methods and procedures of clinical psychology when she relied on the December 26, 2013, interview and Plaintiff's medical records in forming her opinions. Nor does Ungerland's report provide even a cursory analysis grounding her findings in scientific methodology. Consequently, this court finds the proffered testimony unreliable under *Daubert*.

evidence of bad faith with regard to the non-production of the referenced documents. Furthermore, Plaintiff has not shown that she objected to any disclosed discovery, or that she filed a motion to compel the allegedly missing documents. Under these circumstances, the Court declines to draw an adverse inference. *See Ford v. Potter*, 354 F. App'x 28, 33 (5th Cir. 2009) (district court did not abuse its discretion in declining to draw an adverse inference where party did not object to discovery or file motion to compel requested discovery).

## V
## <u>Denial of Promotion</u>

Plaintiff brings her discrimination claims under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act. Doc. #1 at ¶ 3. "Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., prohibits discrimination on the basis of race, color, religion, sex, or national origin in federal and private employment." *Fitzgerald v. Sec'y, U.S. Dep't of Veteran Affairs*, 121 F.3d 203, 206 (5th Cir. 1997). The law also prohibits retaliation against any employee or applicant for employment because such person "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "Like [T]itle VII, § 1981 prohibits discrimination in private employment against anyone, regardless of his race." *Reilly v. TXU Corp.*, 271 F. App'x 375, 379 (5th Cir. 2008) (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87 (1976)). Section 1981 also encompasses claims of retaliation. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451 (2008).

"The elements of the claims under Title VII and [Section 1981] are identical. [Courts] therefore evaluate both claims using the same analysis." *Pratt v. City of Houston, Tex.*, 247 F.3d 601, 606 n.1 (5th Cir. 2001) (internal citations omitted). To this end, a plaintiff "can prove

discrimination through direct or circumstantial evidence." *Davis v. Miss. Transp. Comm'n*, 618 F. Supp. 2d 559, 561 (S.D. Miss. 2009) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)).

## A. Direct Evidence

"Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). Here, Plaintiff points to four pieces of evidence as direct evidence of discrimination: (1) Marcus' statement regarding the merit of dissertation publishing in Germany; (2) Marcus' observation in his Memorandum that "English is not [Plaintiff]'s first language [and s]he uses Powerpoint frequently and shows motives to overcome the language barrier;" (3) a statement Marcus made in 2007 that Plaintiff had been "suspicious and uncomplimentary of persons of Japanese descent;" and (4) evidence that at an unspecified time,[23] Marcus told Plaintiff that her "scholarship [was] not as valuable as [her] American colleagues, and [that she did] not work as hard as [her] American colleagues." Doc. #84-7 at 43.

First, the statements regarding the quality of German publishing and Plaintiff's purported animosity toward the Japanese have no direct relation to Plaintiff's national origin (Chinese), race (Asian), or previous EEOC activity. Accordingly, both statements require inferences to show discrimination and may not be considered direct evidence.

Next, while statements regarding language ability may serve as evidence of national origin discrimination, they may not serve as direct evidence of discrimination in tenure cases because "references to audience difficulty in understanding a Title VII professor seeking tenure may reasonably be interpreted as expressing a concern about … ability to communicate to

---

[23] Although not apparent in the deposition, Plaintiff represents that this remark was made a "year earlier" than her tenure application.

students rather than discriminatory animus based on ethnicity or accent." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 380 (4th Cir. 1995) (citation and internal punctuation omitted); *see also Morin v. Univ. of Mass.*, No. 09-12022, 2012 WL 4461536, at *8 n.5 (D. Mass. July 11, 2012) (finding no direct evidence of discrimination where defendant-university "criticized [plaintiff's] communication skills when English [was] not her native language"); *see also Jun Zhang v. Troy Univ.*, No. 2:11-cv-770, 2012 WL 3631547, at *6 (M.D. Ala. July 23, 2012) ("these remarks about Plaintiff's accent or ability to communicate, at most, support an *inference* of national origin discrimination as one possible meaning and do not present direct evidence of discrimination") (emphasis in original).

Finally, while Marcus' statement regarding Plaintiff's performance relative to her American colleagues was certainly inappropriate, this Court cannot conclude that it is <u>direct</u> evidence that either her low salary or denial of promotion was due to her national origin. Standing alone, the statement reveals that Marcus believed that Plaintiff was not performing as well as her American colleagues. In order for the statement to be evidence of discrimination, the Court would need to infer that Marcus believed that Plaintiff was not performing as well as her American colleagues <u>because she was not American</u>. Because this additional inference is necessary to prove discrimination, the Court cannot find the statement to be direct evidence of discrimination. *See Croft v. City of Roanoke*, 862 F. Supp. 2d 487, 494 (W.D. Va. 2012) ("A statement that simply references gender or some other protected trait, but fails to express any bias against an employee because of that trait, is insufficient to constitute direct evidence of discrimination.") (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).

## B. Circumstantial Evidence Frameworks

When circumstantial evidence is used to support a Title VII claim for race discrimination, national origin discrimination, or retaliation, a court will generally apply the well-known *McDonnell-Douglas* burden-shifting framework. *See Price v. Fed. Express Corp.*, 283 F.3d 715, 719–20 (5th Cir. 2002) (race discrimination case); *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 343 (5th Cir. 2005) (national origin discrimination case); *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001) (retaliation case). Under *McDonnell Douglas*, a plaintiff first must establish a prime facie case of discrimination. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008). "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate … non-retaliatory reason for its employment action. If the employer meets this burden of production, the plaintiff then bears the burden of proving that the employer's reason is a pretext for the actual retaliatory reason." *Id.* (internal citations omitted).

In addition to proving discrimination under the *McDonnell-Douglas* framework, a plaintiff may establish employer liability through what has become known as the "cat's paw" theory of liability. Under the cat's paw theory, a plaintiff may hold an "employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, __U.S.__, 131 S. Ct. 1186, 1190 (2011) (citation omitted).[24] In *Staub*, the United States Supreme Court held that, "if a supervisor performs an act motivated by

---

[24] Courts have employed the cat's paw analysis at various stages of the *McDonnell Douglas* burden shifting framework. *See Clayton v. Vanguard Car Rental U.S.A., Inc.*, 761 F. Supp. 2d 1210, 1263 (D. N.M. 2010) (considering cat's paw under pretext inquiry); *Dwyer v. Ethan Allen Retail, Inc.*, 528 F. Supp. 2d 1297, 1304 (S.D. Fla. 2007) (considering cat's paw under prima facie inquiry). These approaches seem inconsistent with the Supreme Court's dictate that liability attaches where the elements of the cat's paw theory are present, and with the Fifth Circuit's treatment of the theory of liability as a distinct inquiry. *See generally Hervey v. Miss. Dep't of Educ.*, 404 F. App'x 865, 867 (5th Cir. 2010) ("there was no genuine issue of material fact … on either pretext or a 'cat's-paw' theory").

[discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable ....” *Id.* at 1194.[25]

## 1. *McDonnell-Douglas*

### a. Prima Facie

Under *McDonnell-Douglas*, a plaintiff challenging a failure to promote in the academic profession establishes a prima case by demonstrating that: (1) she belongs to a protected group; (2) she was qualified for the position; and (3) she was denied the position in circumstances permitting an inference of discrimination. *Tanik v. S. Methodist Univ.*, 116 F.3d 775, 775-76 (5th Cir. 1997) (tenure case). Defendant concedes the first element of the prima facie case, but argues that Plaintiff was not qualified for the promotion and that she cannot show her failure to be promoted was due to her race, national origin, or previous EEOC activity. Doc. #64 at 23.

### i. Qualification

“At the prima facie stage, a plaintiff’s burden regarding establishment of qualifications is not onerous; she simply must provide evidence that she met the objective qualifications for the position, although she need not show that she was better qualified than the individual selected.” *Hamlett v. Gonzales*, 2005 WL 1500819, at*16 n.15 (N.D. Tex. June 15, 2005) (citing *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001)). Where, as here, qualifications depend on objective and subjective qualifications, “an employee must demonstrate that he meets objective hiring criteria at the prima face case stage, and the issue of whether he meets subjective hiring criteria is dealt with at the later stages of the analysis.” *Medina*, 238 F.3d at 681 (citations omitted).

---

[25] While *Staub* involved the Uniformed Services Employment and Reemployment Rights Act, the Fifth Circuit has applied the opinion’s cat’s paw holding to claims brought under Title VII. *See Gollas v. Univ. of Tex. Health Sci. Ctr. at Houston*, 425 F. App’x 318, 325 (5th Cir. 2011).

Here, it is undisputed that qualification to the rank of Professor requires demonstrated excellence in research and excellence in either service or teaching. The only remotely objective qualification found in the Department's promotion guidelines is a statement that "[i]n addition to published works presented for promotion from assistant to associate professor, the candidate [for professor], at the minimum, must have published another book-length, peer-reviewed historical monograph with a reputable scholarly publisher."[26] Doc. #62-8 at 8.

Here, it appears that the *Lien Heng* book was not a "published work" at the time Plaintiff applied for promotion from Assistant to Associate Professor. Indeed, the Department Head at the time of Plaintiff's promotion testified that the book was not counted as a published piece for the purpose of her application. While there is no evidence as to the reputation of the published *Lien Heng* book, Marcus referred to the book as a "solid piece of work" and three members of Defendant's promotion and faculty committees deemed Plaintiff's application satisfactory. Under these circumstances, the Court concludes that Plaintiff met the minimum qualification for promotion to Professor and that, therefore, she has satisfied the second element of her prima facie case.

## ii.      Evidence of Discrimination

To satisfy the third prima facie requirement, Plaintiff may raise an inference of discrimination by showing "'departures from procedural regularity', 'conventional evidence of bias on the part of individuals involved', or that the plaintiff is found to be qualified … by 'some significant portion of the departmental faculty, referrants or other scholars in the particular field.'" *Tanik*, 116 F.3d at 776 (citation omitted); *see also Lazarou v. Miss. State Univ.*, 923 F.

---

[26] The Department Guidelines refer to a requirement of four external review letters. However, Defendant does not argue that this requirement is a "qualification" for promotion under the prima facie analysis.

Supp. 2d 882, 890 (N.D. Miss. 2013) (citing *Tanik*). There is no dispute that Plaintiff was not found to be qualified by a "significant portion" of reviewers or faculty. Accordingly, to show pretext she must either show "departures from procedural regularity" or "conventional evidence of bias on the part of individuals involved."[27]

Here, the evidence shows that Marcus committed a "serious breach of procedure" when he failed to provide Plaintiff a copy of the Memorandum. Based on this serious breach, the Court concludes that Plaintiff has satisfied her prima facie case as to her promotion claims.

## b. Legitimate Nondiscriminatory Reason

After the plaintiff states a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. *Aryain*, 534 F.3d at 484. At this stage, the defendant "need not persuade the Court." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Rather, it "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at 257. In this regard, the explanation "must be clear and reasonably specific." *Id.* at 258 (citations omitted).

Defendant contends that Plaintiff's promotion application was denied because it was "found – at every level of review – to be deficient." Doc. #64 at 21. More specifically, Defendant has introduced evidence that the Department Committee, Department Head, College Committee, College Dean, Provost, Dean, and Appeals Board all found Plaintiff unqualified for the promotion. Under these circumstances, the Court concludes that Defendant has sustained its

---

[27] At least one court has held that a professor may not establish a prima facie case of discrimination through procedural irregularities without showing conventional bias. *Grant v. Cornell Univ.*, 87 F. Supp. 2d 153, 160 (N.D.N.Y. 2000) ("When paired with evidence of an impermissible motivation, such as race discrimination, [procedural] evidence might support or reinforce an inference of discrimination. Without evidence of discriminatory animus, however, such evidence can not support civil rights liability."). However, *Tanik*'s disjunctive formulation of the test suggests that any of the three enumerated types of evidence (procedural irregularities, conventional bias, significant portion of approvals) may be sufficient.

burden of production to show a clear and reasonably specific justification for the denial of Plaintiff's application.

### c. Pretext

"If the employer articulates a legitimate, non-discriminatory reason for the employment decision, the plaintiff must then be afforded an opportunity to rebut the employer's purported explanation, to show that the reason given is merely pretextual." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (citation omitted). "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (citations and internal quotation marks omitted). When considering pretext, the question "is not whether [the] proffered reason was an *incorrect* reason for … discharge … [but] whether the evidence supports an inference that [the employer] intentionally discriminated against [the plaintiff], an inference that can be drawn if its proffered reason was not the real reason for discharge." *Laxton v. Gap, Inc.*, 333 F.3d 572, 579 (5th Cir. 2003) (emphasis in original).

The Supreme Court recently clarified that "Title VII retaliation claims must be proved according to traditional principles of but-for causation …. This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2533 (2013). However, for national origin and race discrimination claims, a plaintiff may establish pretext by showing that the proffered reason, while true "is only one of the reasons for its conduct, and another 'motivating factor' [was her] protected characteristic." *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (race discrimination); *see also Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 652 (5th Cir. 2004).

Plaintiff argues that pretext is shown by: (1) Marcus' failure to obtain the necessary number of external review letters; (2) Marcus' "misrepresentations of Plaintiff's student teaching evaluations characterizing student evaluations at the department average for white men as excellent but characterizing Plaintiff's teaching as merely satisfactory;" (3) Marcus' "comments that English was not Plaintiff's native language;" (4) Marcus' criticism of German dissertation publishing; (5) an alleged misrepresentation in Marcus' Memorandum regarding the number of scholars the Department normally contacts to receive four letters; (6) Marcus' initial decision to deny Plaintiff's application based on a failure to receive four reviews; (7) Marcus's failure to provide Plaintiff a copy of the Memorandum; and (8) Marcus' decision to write a negative memorandum regarding Plaintiff's application.

Notably, all of Plaintiff's pretext evidence relates to Marcus, one of the lower decision-makers in the promotion process. Plaintiff fails to offer any evidence from which a fact finder could infer that the ultimate decision maker over Plaintiff's application, the President of MSU, acted with any discriminatory animus or did not deny Plaintiff's promotion application based on an apparent lack of qualifications. In the absence of such evidence, the Plaintiff cannot show pretext, and her claim must fail under the *McDonnell Douglas* framework. *See Blasdel v. Nw. Univ.*, 687 F.3d 813, 822 (7th Cir. 2012) (finding no pretext where "[t]here [was] no indication that any member of the medical school's appointments, promotion, and tenure committee, or the dean, or the provost discriminates against women scientists").

### 2. Cat's Paw

As explained above, "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable ...." *Staub*,

36

131 S. Ct. at 1194. In light of this authority, the Court concludes that, to show pretext based on Marcus' discriminatory animus, Plaintiff must show that: (1) Marcus performed an act (or acts) motivated by discriminatory animus; (2) that the acts were intended to cause an adverse employment action; and (3) the acts were the proximate cause[28] of Plaintiff's denial. *See e.g.* *Blasdel*, 687 F.3d at 823 (observing that a plaintiff could state a claim for discrimination if department head "actuated by a desire to maintain the physiology department as a male bastion, falsely charged [professor] with plagiarism and the falsity was not discovered until after she was denied tenure").

### a. Discriminatory Actions and Intent

Plaintiff contends that Marcus issued his Memorandum based on discriminatory animus.[29] Doc. #82 at 3. Accordingly, the question becomes whether Marcus made this misstatement with discriminatory animus and with the intent to cause an adverse employment action.

First, the Court concludes that, insofar as the Memorandum accompanied a recommendation against denying Plaintiff's promotion application, there is a genuine issue of material fact as to whether the misstatement was made with the intent to cause an adverse employment action.

---

[28] Courts applying *Staub* to Title VII cases have applied the "proximate cause" requirement to claims for discrimination. *See Rajaravivarma v. Bd. of Trustees for Conn. State Univ. Sys.*, 862 F. Supp. 2d 127, 150 (D. Conn. 2012). But the Sixth Circuit, citing to *Nassar*, has suggested that "the cat's paw theory of liability must be modified in Title VII retaliation cases." *See Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 585 n.7 (6th Cir. 2014). Because the Court concludes that Plaintiff's cat's paw retaliation claim fails at the first stage of the analysis, it need not decide what level of causation is required for a Title VII or section 1981 cat's paw retaliation claim.

[29] Although Plaintiff does not explicitly reference the cat's paw theory in her response brief, the substance of her claims make clear that she seeks to invoke liability under this theory. *See Johnson v. BE & K Constr. Co., LLC*, 718 F. Supp. 2d 988, 1002 (S.D. Iowa 2010) ("Though none of the parties mentions the theory, Plaintiff's assertions equate in substance to a contention that BE & K is responsible for ADM's discriminatory motivations under a 'cat's paw' theory of liability.").

Turning to the issue of discriminatory animus, Plaintiff has offered absolutely no evidence from which the Court could infer that Marcus issued the Memorandum based on Plaintiff's race or prior EEOC activity. Accordingly, her retaliation and race based promotion claims must fail.

On the issue of national origin, Plaintiff relies primarily on the Memorandum's statement regarding her native language, and Marcus' undated observation that her work was not as valuable as her American colleagues. In evaluating these statements, the Court notes that "comments are evidence of discrimination only if they are "1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of adverse employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010) (internal quotation marks omitted). If a comment does not meet the four requirements, it is considered a "stray remark." *Id.* Stray remarks are, "standing alone … insufficient to defeat summary judgment." *Id.* However, "[w]here a plaintiff offers remarks as circumstantial evidence alongside other alleged discriminatory conduct … a plaintiff need only show (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012) (citations omitted); *see also Acker v. Deboer, Inc.*, 429 F. Supp. 2d 828, 846 (N.D. Tex. 2006) ("The Fifth Circuit has recognized the inherent value of workplace remarks as circumstantial evidence of discriminatory intent, even though such remarks may be 'stray remarks' that would not ordinarily suffice as direct evidence of employment discrimination."). Additional evidence of discriminatory conduct may be found in "departures from procedural

norms, a history of discrimination against others similarly situated, or by circumstantial evidence, such as a pattern of conduct inexplicable on grounds other than race." *Gomiller v. Dees*, No. 4:06-cv-33, 2007 WL 1031359, at *3 (N.D. Miss. Mar. 29, 2007) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)).

Because comments must be made close in time to the adverse action, "[t]he absence of specification of the time frame of [an] alleged hostile comment also deprives it of probative value, rendering it a mere stray remark." *Coleman v. Exxon Chem. Corp.*, 162 F. Supp. 2d 593, 624 (S.D. Tex. 2001). Here, Plaintiff has failed to specify a time frame for Marcus' alleged comment regarding the merits of her scholarship. Accordingly, the Court must conclude that it, standing alone, is a stray remark.[30] However, insofar as Plaintiff offers the scholar comment alongside other allegedly discriminatory conduct (the remark concerning her accent, procedural departures, and misstatements), the evidence may be relevant if it shows discriminatory intent and if the speaker (Marcus) had leverage or influence over the ultimate decisionmaker (the President of MSU). *Reed*, 701 F.3d at 441.

Drawing every reasonable inference in favor of Plaintiff, the Court concludes that the comment regarding the quality of Plaintiff's scholarship relative to her colleagues is sufficient evidence of bias at this stage. Furthermore, as explained more fully below, the Court concludes that there is a genuine issue of material fact as to whether Marcus possessed influence or leverage over the President of MSU with regard to Plaintiff's promotion application. Accordingly, the comment may serve as circumstantial evidence of discrimination.

---

[30] When asked about the time frame during her deposition, Plaintiff answered "when I went to ask him about salary increase, I think 2010. Or what was the year? I'm not sure." Doc. #84-7 at 52. Even if the comment occurred in 2010, it still would be a stray remark. *See Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001) (comment made one year before adverse action was a stray remark).

As to the comment regarding Plaintiff's native language, the Court notes that, as explained above, remarks about language and accents may qualify as circumstantial evidence of national origin discrimination. *See Jun Zhang*, 2012 WL 3631547, at *6 ("these remarks about Plaintiff's accent or ability to communicate, at most, support an *inference* of national origin discrimination as one possible meaning and do not present direct evidence of discrimination"). However, any such inference must be tempered by recognition that a professor's speaking ability is directly related to job performance. Here, Marcus' comment regarding Plaintiff's familiarity with the English language was made in the context of an evaluation of Plaintiff's teaching performance. Under these circumstances, the Court concludes that the statement is of little evidentiary value in showing bias. *See Forsythe v. Bd. of Educ. Of Unified Sch. Dist. No. 489, Hays, Kan.*, 956 F. Supp. 927, 933 (D. Kan. 1997) ("Although Forsythe identifies a few instances in which some employee of the Board may have mentioned or commented on her accent in an uncomplimentary or derogatory manner, the majority of those comments arose in the context of evaluating Forsythe's teaching skills or addressing student/parent concerns.") (internal footnote omitted).

While the context of the native language comment renders it of little to no probative value in the discrimination inquiry, there is no similar mitigating factor as to the comment comparing Plaintiff to her American colleagues. To the contrary, the comment unambiguously shows that Marcus, at least on some level, differentiated between faculty members' scholarly value on the basis of national origin. *See Watson ex rel. Watson v. Jones Cnty. Sch. Dist. ex rel. Jones Cnty. Sch. Bd. of Educ.*, No. 2:07-cv-100, 2008 WL 4279602, at *7 (S.D. Miss. Sep. 11, 2008) (finding inference of discrimination where school principal "expressly referenced the

students' race when explaining why he had deemed the assault sufficiently serious to warrant students' arrest").

Drawing every reasonable inference in favor of Plaintiff, the evidence shows that Marcus: (1) at an unspecified time, told Plaintiff that her scholarly work was not as valuable as her American colleagues; (2) issued a recommendation which included a false statement regarding Plaintiff's scholarly work (that her book was counted toward her tenure application) and a false statement impugning Plaintiff's standing within the scholarly community (that the Department never had to contact more than ten reviewers to receive four letters); and then (3) committed a serious breach of tenure procedure by failing to give Plaintiff a copy of the recommendation. While it is a close call, the Court concludes that these circumstances create a genuine issue of material fact as to whether the issuance of the Memorandum was motivated by discriminatory animus as to Plaintiff's national origin. *See Awugah v. Key Bank Nat'l Ass'n*, No. 2:12-cv-97, 2013 WL 950694, at *4–5 (D. Me. Mar. 12, 2013) (denying summary judgment based on cat's paw liability where the plaintiff "introduced no written or oral statements indicating a retaliatory animus" but introduced evidence that her supervisor lied in a disciplinary proceeding).

### b. Causation

Although Plaintiff references numerous "misstatements" in the Memorandum, she only suggests that one – the observation that her *Lien Heng* book was counted toward her tenure application – influenced decision makers in the process. Defendant argues that "the debate over whether Wu's book was given consideration in 2003 or should have been considered in 2011 is of no consequence. Wu's application for promotion was not denied for this reason; rather, her

deficient scholarly publication record was just one of many criticisms of her work, and the debate over the book was just one piece of the puzzle." Doc. #92 at 7.

First, contrary to Defendant's contention, the issue of whether Wu published her second book before or after receiving tenure is of great consequence. As discussed above, the publication of a book following grant of tenure was a minimum qualification of promotion to Professor in the Department. Indeed, at least one member of the College Committee testified that the book's alleged prior publication was his "main issue" with Plaintiff's publication. Another College Committee member testified that he "counterbalanced" positive statements based on Marcus' "letter regarding some of the claimed research having already been applied to promotion to Associate Professor."

Furthermore, while Defendant suggests that Plaintiff's application was denied for many reasons, the cat's paw inquiry does not require that the discriminatory act be the *only* cause of an adverse employment action. *Staub*, 131 S. Ct. at 1192 ("The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes.") (emphasis in original). Rather, the plaintiff need only create a genuine issue of material fact as to whether the discriminatory act was a *proximate cause*. *Id.* "Proximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect." *Id.* at 1192 (internal punctuation and quotation marks omitted). Courts have found proximate cause to invoke cat's paw liability even where there is no evidence that an ultimate decision maker considered a discriminatory recommendation. *See, e.g., Polion v. City of Greensboro*, __ F. Supp. 2d __, No. 13-0244, 2014 WL 2611562, at *13 (S.D. Ala. June 10, 2014) ("Without acknowledging *Staub*, the defendants assert that '[n]ot one Grievance

42

Committee member states any reliance on the alleged testimony of Chief Hudson.' Quite so, but they have neither denied having taken Hudson's testimony or recommendation into account nor stated that termination was entirely justified apart from his testimony and recommendation."); *see also Baldwin v. Holder*, No. H-09-842, 2011 WL 2078614, at *11 (S.D. Tex. May 26, 2011) (finding genuine issue of material fact as to proximate cause where ultimate decision maker reviewed case file with discriminatory recommendation).

Here, the evidence shows that Provost Gilbert, the person responsible for delivering the final recommendation to the ultimate decisionmaker, MSU's President, not only considered the Memorandum but was influenced by it. The Court concludes that where the person responsible for making a final recommendation is influenced by a document containing a material misstatement, there is a genuine issue of material fact as to whether the misstatement was a proximate cause of the ultimate decision. Accordingly, summary judgment on Plaintiff's wrongful denial of promotion claim based on national origin should be denied.

## VI
## Salary Discrimination

Generally, claims for pay discrimination under Title VII and section 1981 are evaluated under the *McDonnell Douglas* framework explained above.[31] *Taylor v. United Parcel Serv., Inc.* 554 F.3d 510, 522 (5th Cir. 2008). "To make out a prima facie case of discrimination in compensation, a plaintiff must show that he was a member of a protected class and that he was paid less than a non-member for work requiring substantially the same responsibility." *Id.* (citation omitted).

---

[31] Plaintiff does not assert direct evidence of discrimination or suggest cat's paw liability with regard to her pay claim.

For purposes of the motion for summary judgment, Defendant concedes that Plaintiff can meet her prima facie case. Doc. #64 at 9. However, Defendant argues that summary judgment is appropriate because Plaintiff's pay disparity may be explained by "at least three factors[:] (i) a condition known as 'salary compression,' 'inversion,' or 'market equity'; (ii) raises earned by faculty members when they obtain promotions; and (iii) the allocation of merit-based pay raises." *Id*. at 9–10.

Where, as here, a defendant "does not argue that each factor alone would … have independently resulted [in the challenged action, an employee] … need not show that all of the factors articulated … are false but rather, only that some of the factors are false and a mere pretext for discrimination." *Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2006). Accordingly, to survive summary judgment, Plaintiff need only show that either the reason of salary compression or merit-based pay increases was false or not a legitimate nondiscriminatory reason. *Id*.

With regard to salary compression, Marcus explained:

'Salary compression' is a race-neutral condition whereby newly-hired and often less experienced faculty members make higher salaries than those who have worked at the university longer and, in many cases, have obtained a higher rank. Salary compression occurs because MSU, like many other universities, establishes salaries for new or vacant positions at rates that are driven by outside market forces in an effort to compete with other institutions when attempting to fill faculty positions.

Doc. #64-1 at ¶ 17.

Plaintiff contends that the Fifth Circuit has rejected salary compression as a legitimate reason for pay discrepancies and that even if it could be deemed legitimate, it is a false reason for her pay disparity. Doc. #82 at 22–23 (citing *Siler-Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio*, 261 F.3d 542 (5th Cir. 2001) and *Sauceda v. Univ. of Tex. at Brownville*, 958 F. Supp.

2d 761 (S.D. Tex. 2013)). The two cases Plaintiff cites regarding this theory both hold that, in Equal Pay Act cases, a defendant may not justify pay discrepancies merely by arguing "that the wage differential is justified, given that the salary paid to a new employee is driven almost entirely by market forces …." *Siler-Khodr*, 261 F.3d 549; *see also Sauceda*, 958 F. Supp. 2d at 779–80. Defendant contends that these cases are inapposite because they held that a "party cannot justify the differences in compensation paid to men and women based upon an argument that the market for women employees is different from that for men employees" and because "the legal standards for an Equal Pay Act case … differ entirely from the standards for Title VII cases, where a defendant has only a burden of production, as opposed to a burden of proof." Doc. #92 at n.9.

As pointed out by Defendant, the Equal Pay Act places a burden of proof on defendants following the establishment of a prima facie case of pay discrimination. *Siler-Khodr*, 261 F.3d at 545. In contrast, a Title VII defendant need only produce "admissible evidence of its legitimate, nondiscriminatory reason for the pay disparity." *Jones v. Chevron U.S.A., Inc.*, 932 F. Supp. 2d 794, 798 (S.D. Tex. 2013) (citing *Taylor*, 554 F.3d at 522). While "its burden is light, the employer must articulate its nondiscriminatory reason with some specificity in order to afford the plaintiff 'a full and fair opportunity to demonstrate pretext." *Jones*, 932 F. Supp. 2d at 798 (quoting *Burdine*, 450 U.S. at 255–56)).

Here, Defendant introduced evidence in the form of an affidavit by Marcus that salary compression occurred because it establishes "salaries for new or vacant positions at rates that are driven by outside market forces" and that this policy resulted in a discrepancy in pay amongst its faculty. Doc. #64-1. However, Defendant does not even attempt to define the market forces that allegedly influenced the starting salaries.

"[T]he unseen hand of the market does not enjoy a presumption that is free from … discriminatory assumptions and stereotypes …." *Sauceda*, 958 F. Supp. 2d at 780. Following this logic, to meet its burden of production at the second prong of the Title VII burden shifting framework, a defendant must do more than cite to general market forces as a basis for salary differentials. Rather, it must point to specific *nondiscriminatory* influences on the relevant market. For example, in *Ross v. University of Texas at San Antonio,* the Fifth Circuit held that a defendant-university stated a legitimate nondiscriminatory reason when it cited the "market forces" of "discipline, market demand and degree" as justification for a difference in salary. 139 F.3d 521, 526 (5th Cir. 1998). Similarly, in *Cullen v. Indiana University Board of Trustees*, the Seventh Circuit held that a defendant-university stated a legitimate nondiscriminatory reason for a high-paid hire when it introduced evidence that "the national applicant pool was small, and the University found it necessary to offer [the candidate] a significant salary to attract him to take the position." 338 F.3d 693, 703 (7th Cir. 2003). In *Rosen v. Columbia University*, a district court in the Southern District of New York found a legitimate non-discriminatory reason based on "consideration of several factors, including an individual's qualifications, reputation in the field, importance to the school, budgetary constraints, and desire to attract the candidate to the School." No. 92-cv-6330, 1995 WL 464991, at *7 (S.D.N.Y. Aug. 7, 1995).

Unlike the defendants in the preceding cases, Defendant has failed to define the "market forces" that allegedly influenced its allegedly nondiscriminatory reason of salary compression. Under these circumstances, the Court must conclude that Defendant has not afforded Plaintiff a fair opportunity to show pretext as to salary compression and that, therefore, Defendant has failed to show at this stage that salary compression is a legitimate nondiscriminatory reason for the challenged salary discrepancies. *Burdine*, 450 U.S. at 255–56. Having found that Defendant

has failed to meets its burden of production as to one of its interlocking nondiscriminatory reasons, the Court concludes that summary judgment is not warranted on Plaintiff's claims for salary discrimination. *Asmo*, 471 F.3d at 598.

## VII
## Plaintiff's Motion for Partial Summary Judgment

Plaintiff's motion for partial summary judgment seeks summary judgment on two issues: (1) that she is "Asian female of Chinese origin;" and (2) that she "filed EEOC charges." Doc. #57, #58. Insofar as there is no dispute as to these facts, Plaintiff's motion will be granted.

## VIII
## Conclusion

For the reasons set forth above: (1) Plaintiff's motion for partial summary judgment [57] is **GRANTED**; (2) Defendant's motion to exclude the expert testimony of Donald Rubin [50] is **GRANTED**; (3) Defendant's motion to exclude the testimony of Saranna Thornton [60] is **GRANTED**; and (4) Defendant's motion to exclude the testimony of Brenda Ungerland [55] is **GRANTED**. Finally, Defendant's motion for summary judgment [62] is **GRANTED in Part and DENIED in Part**. Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's claims for retaliation and race discrimination arising from denial of her promotion. Defendant's motion for summary judgment is **DENIED** as to Plaintiff's salary discrimination claims and her claims for national origin discrimination arising from the denial of her promotion application.


SO ORDERED, this the 7th day of November, 2014.

**/s/ Debra M. Brown**　　　　　　　　　　
**UNITED STATES DISTRICT JUDGE**